### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**PATRICIA B. COATES,**

**Plaintiff,**

**-vs-**                                                    **Case No.  6:07-cv-1288-Orl-GJK**

**COMMISSIONER OF SOCIAL SECURITY,**

**Defendant.**

_____

### MEMORANDUM OF DECISION

Plaintiff Patricia B. Coates ("Coates") appeals to the district court from a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for disability insurance benefits.  *See* Doc. No. 1 ("Complaint"). For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

**I.      BACKGROUND**

Coates was born September 23, 1954.  R. 35.  On September 29, 2004, the date of Coates' alleged onset of disability, she was fifty (50) years of age.  R. 14, 59, 370.  Coates received her college degree in nursing, and Coates' past relevant work experience includes being employed as a registered nurse for twenty-five to thirty years.  R. 51-60, 370.

On January 20, 2000, when Coates was forty-five years of age, she presented to a neurologist, Dr. Ralph J. Zwolinski ("Dr. Zwolinski") complaining of "shock-like sensations radiating into the arms."  R. 168.  Dr. Zwolinski reported that Coates has a "longstanding history of degenerative arthritic changes in the cervical spine . . . but no surgical intervention" had been

recommended. *Id.*   Dr. Zwolinski opined that Coates' degenerative arthritic changes and disc disease were probably the source of the pain. *Id.*  His neurological examination revealed that Coates' had "good range of motion at the neck," normal strength in upper extremities, normal sensation, and there was "no evidence of atrophy or fasciculations." *Id.*  He placed Coates on medication and scheduled follow up visits. *Id.*  Dr. Zwolinski also noted that Coates has hypertension and hypothyroidism. *Id.*  Coates continued to seek treatment from Dr. Zwolinski every few months until the February 8, 2007 final hearing before the Administrative Law Judge ("ALJ").  R. 127-69, 199-264, 309-18, 332-36.

On December 14, 2000, after having to continually lift a patient for several weeks, Coates presented with "an exacerbation of back pain," and Dr. Zwolinski changed her medication, increasing the dosage of some of her medications and adding others. R. 164.  On March 1, 2001, Dr. Zwolinski recommended that Coates undergo the McKenzie Back Program due to her continued back pain and he prescribed Paxil for "mild depression." R. 163.[1]  On August 6, 2001, Coates reported that the McKenzie Back Program and various medications were helping her back pain and depression. R. 161.  Although Coates continued to have chronic back pain, on November 1, 2001, Dr. Zwolinski reported that the medication "works quite well for her" and that her "[r]eflexes are normal in the lower extremities" and Coates' "[s]trength is excellent, with normal tone." R. 160.

On January 28, 2002, Dr. Zwolinski reported that:

> The patient has not been seen for three months.  She continues working and continues to have chronic neck and back problems. She did have an exacerbation within the last month and continues to do the McKenzie neck and back program, but she admits that

---

[1] On May 11, 2001, Coates reported to Dr. Zwolinski that the Paxil successfully combated her mild depression issues.  R. 162.

> she does not do this as much as she should.  She states that
> massage therapy has helped her in the past. . . .  Strength is
> symmetrical throughout. . . .  Reflexes are symmetrical. . . .
> Sensation is intact. . . .  There is no tenderness to palpation
> throughout the lumbar paraspinal muscles.

R. 159.  In April of 2002, Coates continued to do well on her medications and continued to have

a "good range of motion of the neck in flexion, extension, and lateral bending."  R. 158.  "There

is no evidence of any palpable spasms or tenderness to palpation in the cervical paraspinal

muscles."  *Id*.

On May 6, 2002, Coates presented with increasing pain and spasms over the right

trapezius muscle.  R. 156.  Dr. Zwolinski noted a "tight trigger point over the middle portion of

the levator scapula muscle," but Coates was otherwise "neurologically intact."  *Id*.  Dr.

Zwolinski administered a "trigger point injection" to Coates' right levator scapula muscle and

informed Coates that she might benefit from Botox injections.  R. 157.  At her next appointment,

on July 8, 2002, Coates reported that the injection took the spasms away.  R. 155.[2]  Dr.

Zwolinski reported a continuing diagnosis of chronic cervical radiculopathy.  *Id*.  However, on

September 19, 2002, Coates again presented with acute "burning-type sensation" spasms over

the right side of her trapezius muscle.  R. 154.  Dr. Zwolinski again administered a trigger point

injection.  *Id*.

Coates' diagnosis of chronic cervical radiculopathy, cervical spasm, and cervical

sprain/strain continued throughout 2003.  On February 3, 2003, Coates reported to Dr. Zwolinski

that:

> She is having more pain over the right trapezius muscle.  She tells
> me that she has been doing a lot of lifting since last being seen in
> December 2002.   She is having more spasm[s] and having

---

[2] Coates' neck continued to show a good range of motion.

> difficulties with sleeping on her right shoulder because of pain in the right side of her neck. . . . There is a severe trigger point palpable over the right trapezius muscle and levator scapular muscle.  Right and left lateral rotation [of the neck] is decreased. . . . Otherwise, she is neurologically intact.

R.  152.   Dr.  Zwolinski  administered  another  trigger  point  injection  and  continued  her

medication.  *Id.*  Coates returned to Dr. Zwolinski on February 27, 2003, and reported that her

pain was normally 6 on a scale of 1 to 10, but the medication was helping to relieve her pain.  R.

151.  On May 22, 2003, Dr. Zwolinski reported that:

> The patient is here for follow-up of her cervical strain.  She is actually doing better than she was even on her last visit.  Her pain level is down 1-2/10 on a 1-10 scale while taking [her medication]. . . .  Strength testing is 5/5 in all groups tested in the upper extremities.  There is good tone throughout.  Sensation is intact to pin, touch, position, and vibration in the upper extremities. . . . Gait is normal with good toe, heel, and tandem walking.

R. 149-50.   Until November of 2003, Coates continued to do well with regard to her pain,

strength, and range of motion in her neck.  R. 148.

On November 17, 2003, Coates presented with more pain on the right side of her neck

and "decreased range of motion to the right side."  R. 146.   While Dr. Zwolinski reported no

change in diagnosis or overall condition, he stated that:

> She does have decreased left lateral rotation.  She has 80° of right lateral rotation.  She has torticollis noted with her head slightly to the left.  She has severe spasm over the right superior trapezius muscle.  Otherwise she is neurologically intact.

R. 146.   Coates  was  given  another  trigger  point  injection  and  continued  on  her  regular

medication.  R. 147.

4

On May 12, 2003, Coates presented to Dr. Tamara Ray Clancy for "probable left carpal tunnel syndrome." R. 341.[3]  Dr. Clancy's notes reveal that Coates injured her left had at work on December 27, 2001.  *Id.*  Coates stated that she was doing "50%" better, and Dr. Clancy injected her left carpal tunnel.  *Id.*  The physical examination revealed that Coates had "full motion of her fingers," but "complains still of tenderness dorsally of her hand."  *Id.*  Dr. Clancy recommended that Coates wear a left hand splint "only as needed at work and at night."  *Id.*  On June 16, 2003, during a follow up visit, Coates stated that injection only lasted six to eight weeks and she was experiencing some abnormal sensations in her fingers.  R. 340.  Dr. Clancy's notes state that Coates retained "full flexion" of her fingers.  *Id.*  Dr. Clancy did not administer another injection, but recommended that Coates continue wearing the splint.  *Id.*  Dr. Clancy stated that she would consider repeat injection or a "carpal tunnel release" if problems persisted, but the record does not contain any follow up evaluations by Dr. Clancy.  *Id.*

On February 13, 2004, Dr. Zwolinski reported that Coates was doing well on her medication and that no new problems had arisen.  R. 145. Coates had a normal gait, fine motor coordination, and strength in her upper extremities.  *Id.*  Coates returned on May 4, 2004, for a trigger point injection and Dr. Zwolinski noted that although she continues to have pain, the medication and trigger point injections work well.  R. 143.  Coates continued to have a decreased range of motion in her cervical spine, but her motor strength in her upper and lower extremities remained normal.  *Id.*

On October 12, 2004, Coates applied for Social Security Disability insurance benefits ("SSI"), alleging a disability onset date of September 29, 2004.  R. 14, 59, 358, 370.   On

---

[3] The record indicates that Coates had sought treatment from Dr. Clancy previously, but this is the earliest treatment evaluation in the record.  *See* R. 341 ("The patient is back in.").

5

October 18, 2004, Coates sought another trigger point injection from Dr. Zwolinski.  R. 141.

Coates reported that "**the previous injections into trigger point have provided substantial**

**and prolonged relief of spasm.**"  R. 141 (emphasis in original).  Coates denied any new

neurological, medical, or other problems since her previous visit.  *Id*.  Dr. Zwolinski maintained

the same diagnosis and again stated that Coates had a "restricted range of motion of the neck in

flexion, extension and lateral bending." *Id*.  "There is exquisite tenderness to palpation of the

cervical paraspinal muscles, especially on the right side." *Id*.  Notably, Dr. Zwolinski found no

evidence of atrophy or fasciculations and Coates' motor coordination, sensation, and strength in

the upper extremities continued to remain normal.  *Id*.  Dr. Zwolinski administered another

trigger point injection and continued Coates' medication regimen.  *Id*. at 141-42.

On November 9, 2004, Coates completed Form SSA-3368, the Disability Report.  R. 59-

64.  She stated the conditions that limit her ability to work are hypertension, hypothyroidism,

macrocytic anemia, and GERD.  *Id*. at 59.[4]  In the Disability Report, Coates stated that she

stopped working because she could not sit or stand.  *Id*. at 60.

On November 11, 2004, Coates was treated by Dr. Gohar S. Khan, her long-time primary

care physician for swelling of the ankles.  R. 171, 376.  Dr. Kahn's report shows that Coates had

irritated herniated discs and bilateral ankle swelling due to hypertension.   *Id*.  Coates' general

review showed "[n]o recent history of weakness, fatigue, fever, chills, night sweats, or fainting."

*Id*.  Regarding her head and neck, Dr. Kahn reported "[**n]o recent history of** headaches, head

injuries, head nodules, **neck stiffness**, neck enlargement, **soreness in the neck**, **neck pain**,

nodules in the neck, or neck masses." *Id*. (emphasis added).  Regarding Coates' musculoskeletal

---

[4] Coates maintained that she could not work due to hypertension, hyperthyroidism, macrocytic anemia, and GERD throughout the administrative process below.

system, Dr. Kahn's report shows: "[**n]o recent history of** muscle aches, muscle weakness, muscular cramps or **spasms**, muscular twitching or fasciculations, joint stiffness, joint pains, joint swelling, joint deformities, recent injuries, . . . **back pain**, or hot joints." *Id*. at 172 (emphasis added).  Dr. Kahn also did a physical exam of Coates' back which revealed "the C spine shows no abnormal curvatures, is non-tender and has **full ROM [range of motion]**, the T spine shows no abnormal curvatures and no point tenderness, the L spine shows no abnormal curvatures and no point tenderness, the sacrum shows no deformities and not point tenderness, the coccyx is non-tender and the SI joints show a **full ROM [range of motion]** without point tenderness." *Id*. at 174.

On December 7, 2004, Coates completed the Function Report regarding how her condition limits her activities.  R. 65-72.  In the Function Report, Coates states that her condition affects her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, see, and use her hands.  R. 70.  "Neck and back pain prevent sitting or standing for any length of time."  *Id*. Coates also states that she has weakness in left hand, her feet swell, and her eyes and head hurt when her blood pressure increases.  *Id*.  She states that that she can only walk one block on a "very good day," and then requires twenty to thirty minutes of rest before resuming to walk.  *Id*. Coates also states that she can follow spoken instructions when pain free on some days.  *Id*.

On December 30, 2004, an MRI of Coates' cervical spine was performed at Florida Hospital Ormond Memorial.  R. 328-30.   The MRI findings revealed that "[t]here are posterior osteophytic disk complexes at C4-5, C5-6, and C6-7 levels.  There is mild impingement on the anterior aspect of the cord at C5-6 and C6-7.  There is moderate neural foraminal stenosis on the right at the C5-6 and C6-7 levels."  R. 329.  An MRI was also performed on Coates' brain.  R.

330-331.  The MRI did not conclusively determine that Coates suffered a stroke, but stated that an old stroke could not be excluded.  R. 330 ("I cannot exclude an old Lacunar Infarct. . . ."). The MRI did detect a choroid plexus lesion on the brain "which is most likely benign but warrants follow up in 3-4 months."  *Id.*   The other results of the MRI were unremarkable.  *Id.*

On January 10, 2005, Coates presented to Dr. Zwolinski with a new complaint of "Right Wrist Drop."  R. 199.

> The patient reports that approximately two weeks ago she awoke unable to extend her right wrist.  She was subsequently hospitalized and worked-up for a possible stroke.  No definite pathology . . . found pertaining to the right wrist drop, but there was an abnormality noted on imaging with a lesion present on the [the brain].  The patient denies any new medical . . . problems [other than the right wrist] since last seen.  No new medications have been added. . . .  Gait is normal.  Finger to nose testing is done well.  Fine motor coordination is normal. . . .  Speech is normal.  There is no evidence of any cranial nerve abnormalities. Strength is normal in the upper extremities, proximally and distally. . . . The patient displays decreased sensation in the right thumb and index finger.  She is unable to extend or radially deviate the right wrist.

R. 199.  Dr. Zwolinski's assessment was a right-sided radial nerve palsy.  *Id.*   Dr. Zwolinski's treatment plan called for Coates to wear a brace on her right wrist and engage in range of motion exercises.  *Id.*  On January 24, 2005, Coates returned to Dr. Zwolinski with consistent symptoms. R. 198.  He recommended that she undergo an Electromyography ("EMG") evaluation, continue the range of motion exercises, and take Vitamin B complex daily.  *Id.*   On February 2, 2005, after reviewing the EMG, Dr. Zwolinski diagnosed radial neuropathy of the right wrist.  R. 262.

On January 18, 2005, Coates' initial application for SSI benefits was denied.  R. 37-38. On February 15, 2005, she filed a request for reconsideration.  R. 39.  On September 8, 2005, her request for reconsideration was denied.  R. 40-41.

On March 21, 2005, Coates reported a "marked improvement in her condition."  R. 313.
According to Dr. Zwolinski, she was able to flex and extend the wrist and, although she still has
some difficulty with writing, holding things, and fine manipulation, "overall she feels that she is
returning to normal function."  *Id.*   No changes were made to her treatment.  On July 8, 2005,
Dr. Zwolinski noted that Coates has an "almost complete resolution of her palsy," and no
significant new problems had developed.  R. 312.   Dr. Zwolinski's notes reflect that Coates
applied for SSI disability benefits and requested assistance filling out some paper work.  *Id.*

On May 19, 2005, Dr. Gary Cater, D.O., completed a Physical Residual Functional
Capacity Assessment ("RFC") on Coates based on the medical evidence in the record.  R. 280-
87.   Dr. Cater opined that Coates could occasionally lift and carry a maximum of twenty pounds,
frequently lift or carry a maximum of ten pounds, stand or walk with normal breaks for about six
hours in an eight hour workday, sit with normal breaks for about six hours in an eight hour
workday, and had no limitations in pushing, pulling, or operating hand or foot controls.  R. 281.
Regarding Coates' postural limitations, Dr. Cater stated that she could frequently balance, stoop,
kneel, crouch, and crawl, but she could only occasionally climb ramps or stairs.  R. 282.
Regarding Coates' manipulative limitations, Dr. Cater stated that she would only be limited with
fine finger manipulations, but that she should be able to use her right hand occasionally.  R. 283.
Dr. Cater found no other limitations based on Coates' medical conditions, but did state that her
allegations are "partially credible" regarding the severity of her symptoms.  R. 283-85.

On July 20, 2005, Dr. Zwolinski completed the Physical Residual Functional Capacity
Questionnaire ("RFCQ").  R. 350-54.   In the RFCQ, Coates' diagnosis is right radial nerve palsy
and chronic cervical strain with a prognosis of chronic nerve problems and resolving radial nerve

palsy. *Id*. at 350. He states that her impairments are expected to last at least twelve months and that Coates is not a malingerer. *Id*. at 350-51. Dr. Zwolinski reports that she is capable of low stress jobs, but frequently her pain would interfere with her attention and concentration. *Id*. at 351. Dr Zwolinski states in the RFCQ that she can walk one city block without rest or pain and that she can sit for thirty minutes at one time. *Id*. He also states that she can stand for fifteen minutes at one time without having to sit down or walk around. *Id*. Regarding how long Coates can sit and stand or walk in total during an 8 hour working day, Dr. Zwolinski reports that she can sit for four hours total and stand or walk for about two hours total. R. 352. Dr. Zwolinski further states in the RFCQ that Coates will need to walk every fifteen minutes and must walk for three minutes each time. *Id*. He states that she will need to take four unscheduled breaks during an eight hour working day, but does not report how long of a rest Coates will need before returning to work. *Id*. Regarding how many pounds Coates can lift and carry in a competitive work situation, Dr. Zwolinski states that she can: (1) rarely carry less than ten pounds; (2) rarely carry ten pounds; (3) never carry twenty pounds; (40) never carry fifty pounds. *Id*. Dr. Zwolinski also states that during and eight hour work day Coates can rarely have a sustained flexion of the neck, look up, and hold her head in a static position, but she can occasionally turn her head from right to left. *Id*. at 353. Furthermore, he states that she can rarely twist, stoop or bend and climb stairs, but she can never crouch or climb ladders. *Id*. According to Dr. Zwolinski, she cannot use her right hand during a work day to grasp, turn or twist objects or her right fingers for fine manipulations. *Id*. She can use her right arm for reaching about ten percent of the time during a work day. *Id*. Regarding the same criteria stated above, Dr. Zwolinski states that she can use her left hand and fingers fifty percent of the time, and she can reach with

her left arm ten percent of the time during a work day.  R. 353.  Additionally, the doctor noted that Coates does not need to elevate her feet during prolonged sitting.  R. 352.  Finally, in the RFCQ, Dr. Zwolinski states that Coates impairments will cause her to miss work more than four days per month.  *Id.*

On September 16, 2005, at the request of Dr. Kahn, Coates underwent a diagnostic scan of her lumbar spine and hip.  R. 306-308.  The scan revealed that Coates suffers from osteoporosis in her hip.  R. 304, 307.

On October 5, 2005, Coates presented to Dr. Zwolinski with a "significant spasm in the right trapezius area."  R. 310.  "She continues to display some slight deficits in the right radial nerve, but this continues to improve slowly."  *Id.* Coates' gait, finger to nose testing, fine motor coordination, speech, and strength in the upper extremities remained normal.  *Id.*  Dr. Zwolinski administered a trigger point injection and continued her medication.  *Id.*   On December 23, 2005, Coates reported no significant changes in her condition to Dr. Zwolinski and stated that her right wrist drop continues to improve.  R. 309.   She was provided refills for her medications, but not a trigger point injection.  *Id.*

The record indicates that Coates was not treated again by Dr. Zwolinski until March 21, 2006 whereupon he notes that her right radial nerve palsy was nearly resolved.  R. 317.[5]  Coates continued to have significant tenderness in her right trapezius muscle and requested a trigger point injection because it had previously helped.  *Id.*  Coates' gait, finger to nose testing, fine motor coordination, speech, and strength in the upper extremities remained normal.  Dr. Zwolinski noted that Coates "has **some discomfort** on range of motion of the cervical spine." *Id.*

---

[5] "It appears that her never palsy has just about completely resolved."  R. 317.

(emphasis added).   The doctor administered a trigger point injection, but did not change the doses on her medications.  *Id.*

On June 15, 2006, Coates reported to Dr. Zwolinski that she was experiencing "occasional exacerbation of her neck pain which requires additional medication."  R. 315.  He also noted that while her strength remained normal, "[s]he continues with very subtle decreased grip strength on the right [hand] with some mild decreased sensation to pinprick on the right upper extremity."  *Id.*   Dr. Zwolinski recommended that Coates undergo an additional MRI and possibly intervention pain management.  *Id.*   However, Coates did not wish to repeat the MRI due to cost issues and she did not wish to pursue interventional pain management. *Id.* at 316.  Dr. Zwolinski increased the dosage on her medications and administered a trigger point injection.  *Id.*

On October 2, 2006, a hearing was held before ALJ, Gerald F. Murray.  R. 366-98.[6]   At the hearing, testimony was taken from Coates and a Vocational Expert ("VE"), Jackson McKay. R. 369-93, 394-97.  Coates testified that she became disabled on September 29, 2004 after a bout of hypertension.  R. 370.[7]   Coates acknowledged that the hypertension alone did not keep her from working, but rather it was the cumulative symptoms of her medical conditions.  *Id.* at 371. When asked to describe the symptoms, Coates stated the following:

> I have a loss of balance, I forget, I've had a stroke that presents itself in several different ways.  I have a lesion on my brain.  I have herniated cervical and lumbar disks along with stenosis.  I have polyneuropathy secondary to, oh, my left hand has nerve damage,

---

[6] On September 19, 2005, Coates requested a hearing before an ALJ after a negative determination had been made regarding her claim.  R. 43.  In the request, Coates stated: "I disagree with the determination made on my claim because I believe that I disabled and unable to work due to my hypertension, hyperthyroidism, macrocytic anemia, and GERD."  *Id.*

[7] Coates stated that Dr. Gohar Khan suggested that she apply for disability.  R. 370.

> my right hand has radial nerve palsy, and my feet is primarily from
> my lumber areas, other than the swelling up that produces the
> tingling, but mostly the pain, I would say.  If there was one thing
> that really was the primary reason [for not being able to work], it
> was the pain.

R. 371.  Coates testified that her pain level, when not taking her medication, is 9 or 9.5 on a scale of 1 to 10.  *Id.*   When taking her medication, she stated that her pain remained at level 6 or 7.  *Id.*   Coates was rocking back and forth during the hearing, and she explained that it was necessary to do so to control the pain.  R. 372.

Coates testified that her memory and concentration were affected by her symptoms, but she wasn't sure if that was due to the pain or the stroke.  R. 377.  She did not know when she had the stroke, and stated that her doctors also did not know when the stroke occurred, but she stated that the MRI from 2005 showed that she had a stroke.  *Id.*   When asked by the ALJ whether she had any residual affects from the stroke she replied: "My balance has been off and my concentration, my thinking and that type of thing."  R. 378.

Coates testified that her feet swell up about once or twice a week and when this occurs she stays in bed.  R. 378.  Coates stated that her feet need to be elevated all the time.  *Id.*   When asked by the ALJ if she had been to vocational rehabilitation, Coates stated that she had not, "[b]asically, I don't know that I could sit in one place, or stand, or be still."  R. 381.  Coates maintained that she cannot sit, stand, or walk or more than fifteen minutes at a time, and that she cannot lift more than two or three pounds.  R. 381-83.

The VE testified that Coates' prior employment as a nurse was skilled medium exertional level occupation with transferable skills.  R. 394-95.  The ALJ asked the VE whether there would be occupations available for a nurse of similar age, education, experience and transferable

skills as Coates, limited to sedentary work.  R. 395.   The VE stated that there would be a number of positions available to such a person and that those occupations exist in significant numbers. R. 395-96.   The ALJ then asked the VE the same hypothetical, but limited to person capable of light work.  R. 396.   Again, the VE testified that there are numerous occupations for such a person that exist in significant numbers.  R. 396.

At the hearing, the ALJ expressed concern that Coates' testimony did not equate to the medical records.  Thus, the ALJ ". . . agreed to send Ms. Coates file off to [a Medical Expert], hopefully a neurologist or othopede or pod, to review it an give us an opinion as to how the records could diverge so much from Claimant's testimony of the severity of her problems."  R. 393.  The hearing was continued until February 8, 2007.  R. 393, 399.

On October 16, 2006, Coates presented to Dr. Kahn complaining of pain all over her neck radiating to her right arm.  R. 355.   Coates' neurological exam revealed right side, upper extremity, radial nerve palsy that was aggravated.  R. 357.   The examination of Coates' back revealed a decreased range of motion in the entire cervical spine.  *Id*.   However, Dr. Kahn provided no diagnosis for Coates.  *Id*.

On October 18, 2006, Coates presented to Dr. Zwolinski stating that she had experienced a reemergence of the right radial nerve palsy and was experiencing a cervical spasm.  R. 332. Dr. Zwolinski reported that she was alert and followed commands without any difficulty. Coates' gait, finger to nose testing, fine motor coordination, and speech remained normal. *Id*. Dr. Zwolinski recommended a titration of prednisone, doing another EMG and nerve conduction study of the right upper extremity, and that Coates wear a left hand brace.  *Id*.

14

On February 8, 2007, the ALJ reconvened the hearing. R. 399. Present to testify was Dr. Bruce D. Whitkind, a neurosurgeon. R. 402. Dr. Whitkind testified, after reviewing the medical records in the case, that Coates' impairments or combination of impairments did not meet or medically equal any of the listings. R. 402-03. Dr. Whitkind noted that Dr. Zwolinski's RFCQ was in conflict with the other medical records, including his own records, because "it's well known that somebody with neck pain and, somebody with neck pain and intermittent right radial nerve dysfunction has no limitations for sitting, walking, [or] standing." R. 404. Thus, Dr. Whitkind opined that Dr. Zwolinski's RFCQ has "very questionable validity." *Id.* Dr. Whitkind also testified that Coates' degenerative disks were compatible with someone of her age. R. 406. In summation, Dr. Whitkind testified that:

> [T]his is an intermittent . . . right radial nerve palsy, the findings in the cervical spine are not compatible with [the RFCQ] and the, as far a vocational ability to work and right radial palsy may reoccur at which time she can wear a brace because she has normal functioning in the right hand and this would put her in full-time, I would say probably a sedentary, light level, full-time, 10 to 20 pounds, with the use of the right brace as needed.

R. 407. Dr. Whitkind concluded that Coates' functional limitations would not prevent her from doing light or sedentary work. R. 408-09.

On March 22, 2007, the ALJ issued a decision that Coates was not disabled finding the following:

1. Coates will continue to meet the insured status requirements of the Social Security Act through June 30, 2009.

2. Coates has not engaged in substantial gainful activity since September 29, 2004, the alleged onset date.

3. The medical record reveals that Coates has the following impairments that are

15

"severe" in combination: chronic pain of the neck, right shoulder, and right arm; history of nerve palsy affecting the hands; and degenerative disc disease of the cervical and lumbar spine.

4.     Coates does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).

5.     After careful consideration of the entire record, Coates has the RFC to engage in light work requiring the lifting/carrying of up to 20 pounds occasionally and 10 pounds frequently.  She is able to stand/walk for at least a total of 6 hours per workday.  She is able to sit for at least a total of 6 hours per workday.

6.     Coates is unable to perform any past relevant work.

7.     Coates has acquired work skills from past relevant work.

8.     Considering Coates' age, education, work experience, and RFC, Coates has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy.

R. 14-26.   On May, 9, 2007, Coates requested review by the Appeals Council (R. 10), and on June 11, 2007, the Appeals Council denied review, thereby making the ALJ's decision the final decision of the Commissioner of Social Security.  R. 6-9.

On August 14, 2007, Coates timely appealed the Appeals Council's decision to the United States District Court.  Doc. No. 1.   On March 2, 2008, Coates filed a memorandum in support of her appeal.  Doc. No. 17.  On May 1, 2008, the Commissioner filed a memorandum in support of his decision that Coates was not disabled.  Doc. No. 18.  On July 29, 2008, the parties consented to the jurisdiction of a United States Magistrate Judge.  Doc. No. 22.  The appeal is ripe for determination.

## II.    THE PARTIES' POSITIONS

Coates assigns three errors to the ALJ.  First, Coates claims that the ALJ erred in determining that Coates has the residual functional capacity to perform light work.   More specifically, Coates maintains the ALJ erred by not giving proper weight to Dr. Zwolinski's RFCQ.  Second, Coates claims the ALJ erred by posing a hypothetical question to the VE that did not accurately or adequately reflect Coates' limitations.  Third, Coates argues that the ALJ erred by finding her pain testimony not completely credible.

The Commissioner argues that the substantial evidence existed for the ALJ to determine that Coates could perform light and sedentary work. The Commissioner also maintains that the ALJ's hypothetical question was proper because the ALJ properly discounted the treating physician's RFC assessment.  Finally, the Commissioner argues that the ALJ did not err in evaluating Coates' pain testimony.

## III.    LEGAL STANDARDS

### A.     THE ALJ'S FIVE-STEP DISABILITY ANALYSIS

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled. *See* 20 CFR §§ 404.1520(a), 416.920(a).  The steps are followed in order.  If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 CFR §§ 404.1520(b), 416.920(b).  Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful.  "Substantial work activity" is work

activity that involves performing significant physical or mental activities. 20 CFR §§ 404.1572(a), 416.972(a). "Gainful work activity" is work that is usually performed for pay or profit, whether or not a profit is realized. 20 CFR §§ 404.1572(b), 416.972(b). Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that he has demonstrated the ability to engage in SGA. 20 CFR §§ 404.1574, 404.1575, 416.974, 416.975. If an individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, the ALJ must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe." 20 CFR §§ 404.1520(c), 416.920(c). An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. An impairment or combination of impairments is "not severe" when medical or other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 CFR §§ 404.1521, 416.921.

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993). Accordingly, the ALJ must make it clear to the reviewing court that the ALJ has considered all alleged impairments, both individually and

in combination, and must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *See Jamison v. Bowen*, 814 F.2d 585, 588-89 (11th Cir. 1987); *Davis*, 985 F.2d at 534.   A remand is required where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly.  *Vega v. Comm'r*, 265 F.2d 1214, 1219 (11th Cir. 2001).  If the claimant does not have a severe medically determinable impairment or combination of impairments, he is not disabled. If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, it must be determined whether the claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (the "Listing(s)").  20 CFR §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926.   If the claimant's impairment or combination of impairments meets or medically equals the criteria of a Listing and meets the duration requirement (20 CFR §§ 404.1509, 416.909), the claimant is disabled.  If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, the ALJ must first determine the claimant's residual functional capacity ("RFC").  20 CFR §§ 404.1520(e), 416.920(e).  An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations secondary to his established impairments.   In making this finding, the ALJ must also consider all of the claimant's impairments, including those that may not be severe. 20 CFR §§ 404.1520(e), 404.1545, 416.920(e), 416.945.

Next, the ALJ must determine step four, whether the claimant has the RFC to perform the

requirements of his past relevant work. 20 CFR §§ 404.1520(f), 416.920(f); *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, and pull. *See* 20 C.F.R. § 404.1545(b). The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). If the claimant is unable to establish an impairment that meets the Listings, the claimant must prove an inability to perform the claimant's past relevant work. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established. In addition, the work must have lasted long enough for the clamant to learn to do the job and have been SGA. 20 CFR §§ 404.1560(b), 404.1565, 416.960(b), 416.965. If the claimant has the RFC to do his past relevant work, the claimant is not disabled. If the claimant is unable to do any past relevant work, the analysis proceeds to the fifth and final step.

In the last step of the sequential evaluation process (20 CFR §§ 404.1520(g), 416.920(g)), the ALJ must determine whether the claimant is able to do any other work considering his RFC, age, education and work experience. In determining the physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy. 20 C.F.R. § 404.1567. If the claimant is able to do other work, he is not disabled. If the claimant is not able to do other work and his impairment meets the duration requirement, he is disabled. Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the

Social Security Administration. In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the RFC, age, education and work experience. 20 CFR §§ 404.1512(g), 404.1560(c), 416.912(g), 416.960(c).

**B.     THE STANDARD OF REVIEW**

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (*citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

21

IV.   **ANALYSIS**

A.   **Whether the ALJ Erred In Rejecting Dr. Zwolinski's RFCQ**

Coates argues that the ALJ erred in determining that Coates has the RFC to perform light work.  Doc. No. 17 at 7.  Specifically, Coates argues that the ALJ erred by not giving substantial weight to Dr. Zwolinski's RFCQ.  *Id.*  The ALJ determined that Coates had the RFC to engage in light work requiring the lifting/carrying of up to 20 pounds occasionally and 10 pounds frequently; to stand/walk for at least a total of 6 hours per eight hour workday; to sit for at least a total of 6 hours per eight hour workday.  R. 19.  In making his RFC determination, the ALJ did not give great weight to Dr. Zwolinski's RFQ.  R. 19-20.

Coates argues that the ALJ did not adequately consider the opinion of Dr. Zwolinski and that there is no good cause for rejecting his opinion.  Doc. No. 17 at 8-10.  The Commissioner maintains that the ALJ properly considered Dr. Zwolinski's opinion and rejected it because it was contrary to his own treating records and the remaining medical evidence.  Doc. No. 18 at 6-9.

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician.  *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Lewis v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *Sabo v. Comm'r of Social Security*, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not

22

inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(d)(2).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See Edwards*, 937 F.2d at 580 (good cause existed where the opinion was contradicted by other notations in the physician's own record).  Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding.  *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also, Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the following:

1) length of the treatment relationship and the frequency of examination;

2) the nature and extent of the treatment relationship;

3) the medical evidence supporting the opinion;

4) consistency with the record as a whole;

5) specialization in the medical issues at issue; and

6) other factors which tend to support or contradict the opinion.

20 C.F.R. § 404.1527(d).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also,* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e).

In addressing Coates' RFC, the ALJ noted:

> As for the opinion evidence, no State agency reviewer/examiner/consultant has opined that the claimant is unable to engage in light or sedentary work. On December 2, 2004, a State agency reviewer found Ms. Coates capable of medium work requiring the lifting/carrying of up to 50 pounds occasionally and 25 pounds frequently. No significant limitations were found in the abilities to stand, sit, or walk. No particular postural, communicative, environmental, manipulative, or visual limitations were found. This reviewer, however, did not have the benefit of reviewing subsequent medical evidence or the medical expert's testimony. On May 19, 2005, a State agency reviewer found the claimant capable of light work requiring the listing/carrying of up to 20 pounds occasionally and 10 pounds frequently. No significant limitations were found in the abilities to stand, sit or walk. The reviewer indicated that the claimant is capable of no more than occasional climbing. The claimant's ability to engage in fine manipulation with the right hand was found to be limited. A residual functional capacity for light work accurately reflects the claimant's ability to work in light of the objective medical evidence considered in its entirety. A residual functional capacity for light work is adopted.

R. 19. Regarding Dr. Zwolinski's RFCQ, the ALJ stated the following after thoroughly detailing the entire objective medical record and Dr. Zwolinski's RFCQ:

> This assessment, however, is not entitled to great weight because it is not very well supported by Dr. Zwolinski's treatment records or the general medical evidence in its entirety. The medical record does not indicate that in July 2005, the claimant had any significant impairment in the abilities to stand or sit. As late as March 2005, the physician had noted that the claimant had reported a "marked improvement" in the right radial nerve palsy. She denied that she had any new neurological, medical, or surgical problems since her

24

last visit.   No new medications had been added to her regimen.
Physical examination revealed no significant deficits other than
decreased grip strength on the right.   In July 2005, the physician
noted that the claimant's palsy had almost completely resolved.
Again, physical examination revealed no significant abnormalities
other than minimally decreased perception of pinprick in the right
radial nerve distribution.   The claimant exhibited normal strength
in the upper extremities.   In light of these inconsistencies, Dr.
Zwolinski's assessment of July 20, 2005 is not entitled to great
weight.

R. 19-20.  Substantial evidence existed for the ALJ to determine that Dr. Zwolinski's RFCQ was

inconsistent with the medical record, including Dr. Zwolinski's own records.  *See* supra pp.  1-

12, 14-15.  Indeed, Dr. Whitkind testified that Dr. Zwolinski's RFCQ was of "very questionable

validity" and gave specific reasons for that opinion.  R. 404-06.  The Court may not reweigh the

evidence.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995).  Thus the ALJ did not err

because he had good cause to give little weight to the July 20, 2005 RFCQ.  *See Edwards*, 937

F.2d at 580.

> **B.     Whether the ALJ Erred by Posing a Hypothetical Question to the VE Stating
> Coates Could Perform Light Work.**

Coates argues that the ALJ erred by asking the VE to assume that she could perform light

or sedentary work.  Doc. No. 17 at 11-12.  The underlying basis for Coates' argument is that the

ALJ should have relied on Dr. Zwolinski's RFCQ which would have, if given proper weight,

precluded her from performing even sedentary work.  *Id*. at 12.  However, because the Court has

already determined that the ALJ had good cause to give little weight to Dr. Zwolinski's RFCQ,

the remaining issue is whether the ALJ had substantial evidence to determine that Coates could

perform light work.

Regarding his determination that Coates could perform light work, and after detailing the

medical record, the ALJ stated the following:

> On May 19, 2005, a State agency reviewer found the claimant
> capable of light work requiring the lifting/carrying of up to 20
> pounds occasionally and 10 pounds frequently.  No significant
> limitations were found in the abilities to stand, sit, or walk.  The
> review indicated that the claimant is capable of no more than
> occasional climbing.  The claimant's ability engage in fine
> manipulation with the right hand was found to be limited.  A
> residual functional capacity for light work accurately reflects the
> claimant's ability to work in light of the objective medical
> evidence considered in its entirety.  A residual functional capacity
> for light work is adopted.

R. 19.  The ALJ's finding that Coates could perform light work is supported by substantial

evidence and adequately explained in his decision.  *See also* 20 C.F.R. § 404.1567.  Thus, the

ALJ did not err when he asked the VE to assume Coates could perform light work.

### C.     Whether the ALJ Erred In Finding Coates' Pain Testimony Not Completely Credible.

Coates argues that the ALJ failed to properly evaluate her subjective pain testimony

because the objective medical evidence supports her testimony.  Doc. No. 17 at 12-13.  The

Commissioner argues that the ALJ properly evaluated Coates' pain testimony, including making

a finding that her impairments could reasonably produce the alleged symptoms, and properly

found that the objective medical evidence did not support her testimony regarding the intensity,

persistence, and limiting effects of her symptoms.  Doc. No. 18 at 10-11.

Where an ALJ decides not to credit a claimant's testimony, the ALJ must articulate

specific and adequate reasons for doing so, or the record must be obvious as to the credibility

finding.  *Foote,* 67 F.3d at 1561-62*; Jones v. Dep't of Health & Human Serv.*, 941 F.2d 1529,

1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing

court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986). A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982). If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (*quoting Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

After extensively detailing Coates' testimony, the ALJ made the following finding:

> [T]he undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms. However, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not fully credible. The claimant asserted during the hearing that she has great difficulty with standing and walking. Nothing in the medical record, however, indicates that Ms. Coates is unable to stand or walk for more than very short periods. The medical record does not indicate that her combined impairments are severe enough to cause her to force her to remain in bed. The claimant asserted during the hearing that her condition has been very depressing for her. Though the medical record does not indicate that the claimant has a case of depression or anxiety severe enough to more than minimally affect her ability to work. Her treatment has been limited to prescriptions for routine, psychotropic medications. The claimant has not required psychiatric hospitalizations since the alleged disability onset date. She has not required ongoing, intensive mental health treatment since the alleged disability onset date. During the hearing, she asserted that she had planned on talking to her general practitioner about it during her next visit. At any rate, the medical record does not indicate that the claimant has consistently reported ongoing

problems with depression and anxiety since the alleged disability onset date.

. . .

The claimant's assertion that she continues to suffer stroke residuals is not generally credible.  The medical record does not conclusively show that she suffered a stroke after the alleged disability onset date.  Even if she did suffer a stroke, the medical record does not indicate that she suffers residuals attributable to it.  Examination records regularly reflect that the claimant has been awake, fully orientated, and able to follow commands without difficulty.  She has exhibited a normal gait; normal fine motor coordination; equal, round, and reactive pupils; intact extraocular muscles; normal speech; intact sensation; and no evidence of cranial nerve abnormalities.  Though a scan has revealed a lesion on the choroids complex, the medical records do not indicate that this condition causes the claimant any significant functional deficits.  The medical records do not indicate that Ms. Coates regularly complained of problems with forgetfulness.

. . .

The claimant's assertion that she is unable to lift more than two or three pounds is not very credible.  Again, treatment records regularly reflect that she has been able to demonstrate full strength of the upper extremities.  Though she has been found to have some degenerative disc disease that is characterized by bulging discs in the cervical and lumbar spine, the record does not indicate that she has been found to have disc herniation throughout the cervical and lumbar spine.  An MRI of the spine performed on December 30, 2004 revealed osteophytes at C4-5, C5-6, and C6-7; mild impingement of the anterior aspect of the cord at C5-6 and C6-7; and moderate stenosis on the right at C5-6 and C6-7.  Treatment notes do not indicate that surgery is imminent or that it has been recommended.   The claimant's musculoskeletal condition has generally been managed with trigger point injections, range of motion exercises, and oral pain medications.  During the hearing, the claimant reported that her pain rates a 6 or 7 even when she is on medication.  Treatment records do not confirm this, however.  As late as September 2006, Dr. Zwolinski had noted that the claimant had "been doing well on her medications with a pain level averaging below a 5/10 on 1-10 scale."

. . .

The medical record indicates that the nerve palsy affecting

28

claimant's right wrist has generally responded well to treatment. On July 8, 2005, her treating physician noted that the claimant had ". . . demonstrated almost complete resolution of her palsy." On March 21, 2006, the physician reiterated that the claimant's nerve palsy had just about completely resolved. About seven months later, the claimant reported that she had experienced a recurrence of right radial nerve palsy. No subsequent treatment records addressing this condition are contained in the medical evidence.

. . .

Although the claimant is somewhat impaired and does feel some pain, the evidence considered in its entirety suggests that she is not debilitated to the point of being unable to work. The medical record does not show that Ms. Coates has significant particular problems with seeing, hearings, speaking, or reasoning that would prevent her from sustaining light or sedentary work. Thought the claimant has reported problems with hearing out of her left ear, the record does not indicate that she is not able to hear well enough understand normal, conversational speech. The claimant has testified that she takes Lasix to control edema of the feet. She does not experience severe edema of the feet. All self-reported symptoms and limitations inconsistent with light work are not well supported by the weight of the objective medical evidence; thus, they are not credible.

R. 23-24. The ALJ stated specific and adequate reasons to support his credibility finding regarding the severity and persistence of Coates' symptoms and substantial evidence supports his finding. Thus, the ALJ's credibility determination is affirmed. *See Bowman,* 831 F.2d at 1012; *Bowen*, 786 F.2d at 1054.

## V.   <u>CONCLUSION</u>

For the reasons stated above, the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to enter **JUDGMENT in favor of the Commissioner and close the case**.

**DONE and ORDERED** in Orlando, Florida on September 8, 2008.


_____
GREGORY J. KELLY
UNITED STATES MAGISTRATE JUDGE



The Court Requests that the Clerk
Mail or Deliver Copies of this Order to:

Shea A. Fugate
Law Office of Shea Fugate
1800 Pembrook Dr., Suite 300
P.O. Box 940989
Maitland, Florida        32794

Mary Ann Sloan, Regional Chief Counsel
Dennis R. Williams, Deputy Regional Chief Counsel
Nadine DeLuca Elder, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia         30303-8920

The Honorable Edward Gerald F. Murray
c/o Social Security Administration
Office of Disability Adjudication and Review
Desoto Building, #400
8880 Freedom Crossing
Jacksonville, Florida   32256-1224